***********
The undersigned have reviewed the record and the prior Decision and Order filed by Deputy Commissioner Ghenn. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, or amend the Decision and Order, except for minor modifications.
 ***********
The undersigned find as fact and conclude as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
The following documents were introduced into evidence by stipulation of the parties as:
 EXHIBITS
1. Stipulated #1: Defendant's Response to Plaintiff's First Set of Interrogatories.
2. Stipulated #2: Defendant's Response to Plaintiff's Second Set of Interrogatories.
3. Stipulated #3: ER/Hospital Records.
4. Stipulated #4: Department of Correction Nursing Notes.
5. Stipulated #5: Department of Correction Doctor's Notes.
6. Stipulated #6: Department of Correction Medication Records.
7. Stipulated #7: Department of Correction Sick Calls.
8. Stipulated #8: Department of Correction Grievance Reports.
9. Stipulated #9: Department of Correction Incident Reports.
10. Stipulated #10: Donald Sampson Carpentry Diploma.
11. Stipulated #11: Carpentry Course Syllabus.
12. Stipulated #12: P. Chavis Memorandum.
13. Stipulated #13: Kinlaw Memorandum.
14. Stipulated #14: Delta Saw Manual.
15. Stipulated #15: Orientation Sheet.
16. Stipulated #16: Safety Committee Memorandum.
17. Stipulated #17: Department of Correction Safety Manual.
18. Stipulated #18: Minutes of Safety Meeting.
19. Stipulated #19: Robeson County Community College Attendance Reports. (Marked as Stipulated #1).
20. Stipulated #20: Verification of Responses to Plaintiff's First Set of Interrogatories. (Marked as Stipulated #1).
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following additional
 FINDINGS OF FACT
1. Plaintiff (hereinafter "Alford") was incarcerated in the North Carolina Department of Correction (hereinafter "NCDOC") on September 19, 1996.
2. Alford was a student in a carpentry class at Lumberton Correctional Institution (hereinafter "LCI") taught by Donald Sampson (hereinafter "Sampson"). Sampson was employed by Robeson Community College (hereinafter "Robeson") and assigned to teach a basic level carpentry class in the NCDOC. Sampson's class consisted of some twenty students on the date of Alford's injury.
3. At the time of the hearing before the Deputy Commissioner, Sampson was employed by Robeson and was assigned to LCI. Sampson has a diploma in carpentry from Robeson following one year of instruction in 1982. He has taught carpentry classes at LCI since July 1995 and has prior teaching experience since 1984. In addition, he has sixteen years of practical experience in the carpentry trade, beginning in 1976. He has used table saws for approximately thirty years.
4. Sampson was qualified as an expert witness in the field of carpentry.
5. Alford enrolled in Sampson's carpentry class beginning August 26, 1996. Prior to participating in carpentry activities, Alford attended an orientation. Alford admitted that Sampson provided safety information as a part of the orientation. The attendance record maintained for Sampson's class reflects that Alford was present during the orientation. Sampson testified that as a part of the orientation he teaches and demonstrates the proper use of power tools. Videos are also shown to the class participants. The syllabus from which Sampson teaches the course notes that safety for the proper use of power tools is taught and demonstrated.
6. Alford was in class for approximately four weeks before the incident leading to this civil action occurred. Attendance records fix the date of Alford's entry into the carpentry class as August 20, 1999. During these four weeks Alford used the table saw involved in his injury.
7. On September 19, 1996, Alford was using a table saw as a part of Sampson's class. Alford had used the table saw frequently prior to the date of his injury.
8. Alford was cutting a piece of wood on the table saw. Alford contends that the piece of wood was two feet square and was not plywood.
9. The saw was equipped with a safety guard covering a circular blade that operated at high speed. The safety guard is designed to prevent the operator from accidentally touching the blade while operating the saw and preventing "kick backs." A "kick back" occurs when a piece of wood being cut rides up the saw blade and is thrown back toward the operator. Wood being cut slides under the safety guard, the guard preventing the wood from riding up the blade and being "kicked back." Touching the blade while running and "kick backs" can cause severe injuries.
10. The safety guard was not affixed to the table saw when Alford was using it on the date of his injury. Alford testified he had never seen a safety guard on the table saw during his tenure in carpentry class. He also denies any training on the use of the safety guard or the fact that a safety guard was supposed to be used.
11. Alford admits that he was trained in the use of a "push stick" and was using this device when he was injured. A "push stick" is a piece of wood that is used instead of the hands to push small pieces of wood through the saw blade, thereby protecting the hand from coming into close proximity with the saw blade.
12. Sampson describes the procedure for cutting small stock as:
 a) placing the stock on the table saw and sliding the stock toward the blade with both hands to hold it down;
 b) as the stock enters the blade, the operator's hold on the stock is maintained until such time as a reasonable amount of stock has been cut and the back of the stock is on the table;
c) taking one hand away, obtaining the push stick; and
d) pushing the stock entirely through the saw blade.
13. On September 19, 1996, Alford inserted a piece of wood into the saw and a "kick back" occurred, the stock propelling back toward Alford's face. Alford reinserted the piece of stock, pushing it back down through the blade using his left hand to support the stock. The tip of Alford's left index finger on his non-dominant hand touched the moving blade nearly severing the tip of the finger with a commuted fracture.
14. Sampson was standing some sixteen to twenty-five feet away from the table saw when Alford was injured.
15. The severed finger was medically repaired. The injury was obviously painful. Alford was given significant pain medication. After the healing period, Alford continued to experience sensitivity in the tip of his finger and numbness as late as April 1998. After that date, the medical records do not reflect any further treatment even though Alford testified that he continues to have reoccurring pain in the finger. The left index finger is permanently one-eighth of an inch shorter than normal and the area of injury appears disfigured. The fingernail is also deformed and does not grow naturally.
16. Alford believes that he could have ripped the wood he was working on September 19, 2001 using the safety guard.
17. NCDOC offered the following convictions as evidence to impeach Alford's credibility:
a) First Degree Burglary;
b) Breaking and Entering; and
c) Larceny
18. Thomas Battle (hereinafter "Battle") testified for Alford. He was in the carpentry class with Alford, entering the class two days prior to Alford's accident. He testified that he never saw a safety guard used on the table saw in question. He also testified that the only safety training he received was Sampson telling him to always wear safety goggles when the table saw was operating.
19. Battle did not see the accident because he was operating a miter saw with his back turned to the table saw. He heard the table saw "bind" and then a "clink." He turned and saw Alford holding his fingers.
20. Sampson testified that the table saw on which Alford was injured has a safety guard that must be removed to make certain cuts, especially on small pieces of wood where a "push stick" is used. The safety guard is removed because it obstructs the "push stick" moving the stock completely past the blade after the cut is completed. The safety guard is removed by loosening thumbscrews on the device. Sampson contends that he instructed all students that:
 a) it was their responsibility to ensure that the saw was properly set up for the type of cut they were making; and
 b) if the piece of wood being cut is small and endangers the hands to use a "push stick."
21. Sampson recalls Alford cutting small stock on September 19, 1996, specifically being three-quarters of an inch thick, one and one-half to two inches wide and approximately eighteen inches long. Alford was ripping the thickness of the stock, intending to have two pieces of stock after the procedure, immediately prior to being injured. Sampson testified that he heard Alford make one cut and a "kick back" occurred. Sampson's attention was drawn back to Alford because Sampson heard the saw "kick back," which makes a distinctive sound. According to Sampson, Alford immediately started the cut again and the stock started rising on the saw blade threatening to fully "kick back." Alford reached with his left hand to help push the stock back down when the saw blade penetrated the wood and cut Alford's finger. Alford was not using a "push stick" using both hands. The time between the first cut and Alford starting the second cut in which he was injured was almost immediate.
22. Sampson apparently said nothing to Alford between the first "kick back" and Alford's subsequent attempt to rip the stock. Sampson assumed that Alford would obtain a "push stick" before retrying the cut. Sampson asserted that he had seen Alford successfully make this type of cut before.
23. Sampson denies that the carpentry shop contains any piece of hard wood that is two feet square as Alford testified. The only stock of the size testified to by Alford would be plywood, which Alford denied using.
24. Other students have ripped wood similar to Alford without incident. Alford is the first student who has been injured using the table saw.
25. The greater weight of the evidence establishes that Sampson acted reasonably in instructing class participants, including Alford, in the proper use of power tools used in his carpentry class, including the table saw. While Alford's testimony conflicts with that of Sampson on what the latter taught in regards to safety, Sampson's testimony that he followed the routine course syllabus and taught the proper use of the table saw safety guard is accepted as credible.
26. Sampson adequately supervised Alford at the time of the accident. It is reasonable to expect that a teacher of some twenty students will not always be in the immediate vicinity of each student using the table saw. Imposing such a standard would, in a class in which many activities and projects are being undertaken, practically result in the instructor supervising only those students using the table saw. Such an expectation is unreasonable given the fact that Alford had been instructed in the proper use of the table saw and had used it on prior occasions without incident performing cutting similar to the procedure that resulted in his injury.
 ***********
The foregoing findings of fact and conclusions of law engender the following additional
 CONCLUSION OF LAW
There was no negligence on the part of any named officer, involuntary servant, or agent of the State while acting within the scope of his or her office, employment, service, agency, or authority that proximately caused plaintiff an injury, and plaintiff is entitled to no damages. N.C.G.S. § 143-291 et seq.; See, Taylor v. N.C. Department ofCorrection, 88 N.C. App. 446, 363 S.E.2d 868 (1988).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following
 ORDER
1. Plaintiff's claim must be, and hereby is, DENIED.
2. Each party shall bear its own costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/____________________ THOMAS JEFFERSON BOLCH COMMISSIONER